# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| TYLER JOSSART, | * | |
| | * | No. 15-1377V |
| Petitioner, | * | Special Master Christian J. Moran |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | Filed: August 31, 2026 |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |

Danielle Strait and Jennifer Maglio, Maglio Christopher & Toale, Seattle, WA, for petitioner; Debra A. Filteau Begley, United States Dep't of Justice, Washington, DC for respondent.

**PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS AND ORDER TO SHOW CAUSE**[1]

Tyler Jossart alleged that a human papillomavirus ("HPV") vaccine caused him to suffer postural orthostatic tachycardia syndrome ("POTS"). He did not receive compensation because, in part, he did not establish that he suffered from POTS. Although Mr. Jossart did not receive compensation, he is seeking an award of his attorneys' fees and costs as the Vaccine Act allows.

As described below, a particular controversy is that Mr. Jossart's attorney received a statement regarding Mr. Jossart's diagnosis that the attorney did not file while the entitlement phase was pending. Mr. Jossart's attorney, Danielle Strait, should have disclosed this statement. As such, an order to show cause for why sanctions are not appropriate is being issued.

Notwithstanding this error in professional judgment (which occurred near the end of the case), a reasonable amount of attorneys' fees is $317,101.19.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

## I. Events in Mr. Jossart's Life[2]

Before Mr. Jossart received the allegedly causal vaccination on November 26, 2012, he had a variety of health problems during the first two years of high school. He experienced more episodes during his junior year, which started in the fall of 2012. Although no doctor treating Mr. Jossart during this time recognized these problems as manifestations of POTS, a doctor whom Mr. Jossart retained in the litigation, Lawrence Steinman, opined that Mr. Jossart was suffering from POTS before the vaccination. Exhibit 32 at 15-16.

Four days after the vaccination, Mr. Jossart had a syncopal episode in a friend's car. Exhibit 31.02 at 184 (Nov. 30, 2012). An advanced practice nurse in pediatric cardiology evaluated him and concluded that additional work up was not required. Id. at 183.

In December 2012, Mr. Jossart saw additional doctors, including his primary care doctor, Wendy Barton. Exhibit 5 at 26-27. Due to ongoing abdominal complaints, Dr. Barton referred Mr. Jossart to a pediatric gastroenterologist, Gisela Chelimsky.[3] As discussed below, the opinions of Dr. Chelimsky were critical to the outcome of Mr. Jossart's allegation that the HPV vaccine significantly aggravated his POTS.

Mr. Jossart's first visit with Dr. Chelimsky occurred on December 6, 2012. Based upon her assessment, Dr. Chelimsky ordered additional tests. Exhibit 31.03 at 232-35.

Mr. Jossart underwent a tilt table test on January 3, 2013. Dr. Chelimsky stated that the tilt portion "did not meet the criteria for [POTS]." Exhibit 62 at 38. Instead, she characterized it as a "borderline normal study." Id.

Mr. Jossart followed up with Dr. Chelimsky on January 17, 2013. She assessed him with "borderline POTS, significant orthostatic symptoms, migraines, and nausea." Exhibit 31.04 at 361-64. As discussed below, the parties disputed the meaning of Dr. Chelimsky's notation of "borderline."

For the second half of his junior year of high school, Mr. Jossart saw multiple doctors. He had follow-up appointments with Dr. Chelimsky. He was hospitalized in April 2013, during which a doctor recorded that Mr. Jossart had a history of POTS. Exhibit 31.10 at 1233. Specialists in pain management, who first saw Mr. Jossart during the hospitalization, noted "His history of POTS is somewhat unusual in the fact that his autonomic testing was not consistent with POTS." Exhibit 31.14 at 1684.

---

[2] The recitation of events in Mr. Jossart's life focuses on events most relevant to the reasonableness of attorneys' fees and costs. For a longer summary of events in Mr. Jossart's life, see Entitlement Decision, 2024 WL 4100548, at *3-23.

[3] All references to "Dr. Chelimsky" mean Dr. Gisela Chelimsky. Mr. Jossart eventually saw Dr. Thomas Chelimsky, but he has relatively little importance for the issues in this decision.

Dr. Chelimsky treated Mr. Jossart during his senior year of high school. Mr. Jossart graduated from high school and began to attend college.

While in college, Mr. Jossart's medical care transitioned from Dr. Chelimsky, who treats children and adolescents, to Dr. Thomas Chelimsky, who treats adults. Tr. 75, 187. At the direction of Dr. Thomas Chelimsky, Mr. Jossart underwent another tilt table test. This test was "positive for excessive postural tachycardia with orthostatic symptoms." Exhibit 74 at 13 (January 3, 2017).

The remaining medical records are not relevant to determining a reasonable amount of attorneys' fees and costs.

## II. Procedural History

### A. From Petition to Hearing

Mr. Jossart initiated his claim for compensation in the Vaccine Program by filing a petition on November 13, 2015. Throughout the litigation, attorneys from Maglio, Christopher and Toale, P.C. (also known as "mctlaw") represented him. At the beginning, his counsel of record was John Caldwell. Mr. Jossart initially alleged that his POTS was caused-in-fact by a flu and HPV vaccine administered on November 26, 2012.[4] Over the next few months, Mr. Jossart filed medical records and affidavits.

The Secretary evaluated this material and recommended that compensation be denied. Resp't's Rep., filed pursuant to Vaccine Rule 4 on April 22, 2016. The Secretary requested missing medical records, questioned the diagnosis, and argued that neither a treating doctor nor a retained expert opined that a vaccine harmed Mr. Jossart.

To facilitate the submission of meaningful reports from experts, the undersigned proposed a set of draft instructions on April 28, 2016. After neither party interposed any objection, the draft instructions became final on May 18, 2016. These instructions alerted the parties that the reports from any experts might serve as direct testimony at any hearing.

Mr. Jossart presented Dr. Steinman's first report on August 12, 2016. Exhibit 32. Consistent with the Instructions, Dr. Steinman began his report by describing his qualifications. Dr. Steinman, who often testifies in the Vaccine Program, is board-certified in neurology. He has experience in immunology and has written articles published in peer-reviewed journals on the topic of molecular mimicry. Exhibit 32 at 2; see also Exhibit 33 (curriculum vitae). In the last two decades, Dr. Steinman has cared for approximately a dozen patients with POTS. Id.

[4] Although Mr. Jossart based his claim on the November 26, 2012 flu and HPV vaccines, the parties' experts focused primarily on the HPV vaccine he received on that date in addition to the second dose on January 8, 2013. See Exhibit 32 at 4, 8, 16 (Dr. Steinman); Exhibit A at 12-13 (Dr. Gibbons). Although Mr. Jossart did not amend his petition, he shifted his focus to the two HPV vaccinations. See Pet'r's Pre-hearing Br., filed Aug. 31, 2020.

After this discussion of his qualifications, Dr. Steinman turned to Mr. Jossart's case. He stated, "there is a long history of anteceded illnesses pre-dating the Gardasil immunizations." Exhibit 32 at 4. Dr. Steinman emphasized that Dr. Chelimsky stated on January 17, 2013 that Mr. Jossart has "borderline POTS." Id. at 5. Dr. Steinman maintained that: "Though episodes of syncope antedated the Gardasil vaccinations, the record indicates that the frequency of these episodes intensified following the two Gardasil immunizations." Id. at 8.[5]

Dr. Steinman's first report was discussed in an August 22, 2016 status conference. The parties agreed that Dr. Steinman's opinion shifted the case from a causation-in-fact claim to a significant aggravation claim. Accordingly, a new set of instructions was issued on August 25, 2016 and became final on September 9, 2016.

Dr. Steinman's second report is very similar to his first report. Compare Exhibit 32 with Exhibit 51. In his second report, Dr. Steinman disclosed that he contacted Mr. Jossart's treating doctor, Dr. Chelimsky, to discuss the concept of "borderline POTS" with her. Exhibit 51 at 5.

The parties spoke about Dr. Steinman's conferral with Dr. Chelimsky during a November 28, 2016 status conference. The Secretary asked whether Dr. Steinman possessed any email correspondence with her. The undersigned asked whether Dr. Chelimsky's views on diagnosis affected Dr. Steinman's opinion. Mr. Jossart's counsel, Mr. Caldwell, stated that he did not know but would explore with Dr. Steinman.

Mr. Jossart filed a supplemental report from Dr. Steinman. Exhibit 58. He also presented emails between Dr. Steinman and Dr. Chelimsky. Exhibit 59. The emails consist of Dr. Steinman's introduction and efforts to schedule a phone call. The emails indicate that Dr. Steinman and Dr. Chelimsky spoke on August 11, 2016, but do not reveal any substance of the conversation. Dr. Steinman also sent Dr. Chelimsky an excerpt from one of his reports. Exhibit 60.

The parties discussed Dr. Steinman's reports in an April 5, 2017 status conference. Mr. Jossart was again directed to obtain more information from Dr. Steinman about how much time elapsed from the vaccination to the worsening of POTS. He was also given an opportunity to discuss how Mr. Jossart's symptoms worsened in early 2013. Order, issued April 7, 2017.

The Secretary filed the first set of reports from Dr. Gibbons and Dr. Whitton on October 22, 2018.[6] Like Dr. Steinman, Dr. Gibbons began with a recitation of his qualifications. Dr. Gibbons is board certified in neurology with a subspecialty in autonomic disorders. Exhibit A at 1; see also exhibit B (curriculum vitae). He served as the president of the American Autonomic

[5] Dr. Steinman's reports included sections about how an HPV vaccine can aggravate (or cause) POTS. But this topic is not relevant to assessing a reasonable amount of attorneys' fees and costs. Therefore, this aspect of Dr. Steinman's opinions is not discussed in the present decision.

[6] Dr. Whitton's reports (and some small portions of Dr. Gibbons's reports) discuss whether the HPV vaccination can cause (or aggravate) POTS. Again, these parts are not summarized in this decision.

Society. Id. He has written articles about autonomic disorders published in peer-reviewed journals and lectured other medical professionals on this topic. Id. Dr. Gibbons has treated hundreds of patients with POTS. Id.

After summarizing events in Mr. Jossart's life, Dr. Gibbons quoted an article defining the diagnostic criteria for POTS. A basic aspect of POTS is that the person's heart rate increases when the person stands. According to Dr. Gibbons, "For individuals age 12-19 years, the requirement is at least 40 beats/minute." Exhibit A at 7, quoting Exhibit A-1 (Freeman et al., Consensus statement on the definition of orthostatic hypotension, neurally mediated syncope and the postural tachycardia syndrome).[7] Based largely upon this definition, Dr. Gibbons stated that Mr. Jossart's "autonomic testing from 2013 has a normal heart rate response to tilt table testing, with no evidence of POTS." Id. at 10, citing Exhibit 62 at 9-12. Dr. Gibbons continued: "The notes in the medical records of 'borderline POTS' do not represent a true diagnosis. The term 'borderline' is used to describe a vague problem where a patient may report symptoms with a condition, but testing does not necessarily support a particular diagnosis." Id.

Rather than POTS, Dr. Gibbons thought that other conditions might explain Mr. Jossart's symptoms. These included anxiety, hyperventilation, and somatization disorder. Id. at 12.

Mr. Caldwell stopped representing Mr. Jossart. On May 29, 2019, another attorney from the same firm, Danielle Strait, became counsel of record. Ms. Strait represented Mr. Jossart through the remainder of the entitlement phase.

Dr. Steinman's next report responded to both Dr. Gibbons and Dr. Whitton. For diagnosis, Dr. Steinman stood by his earlier assertion that Mr. Jossart suffered from POTS based upon the diagnosis of "borderline POTS" from Dr. Chelimsky. Exhibit 83 at 1-2. Otherwise, Dr. Steinman "really [had] nothing further to add on this matter of whether POTS is an accurate and correct diagnosis." Id. at 2.

On November 29, 2019, the Secretary filed responses from Dr. Gibbons and Dr. Whitton. Dr. Gibbons stated that Mr. Jossart "was not actually diagnosed with POTS until January 3, 2017 – nearly 4 years after his last HPV vaccination. He carried notes of 'POTS' in his medical records for many years, but actually never came close to meeting criteria for this until 4 years later." Exhibit E at 3.

The Secretary's presentation of these two reports appeared to complete the expert report stage. Thus, the parties were directed to present briefs and other materials regarding entitlement to compensation. Order, issued May 28, 2020.

Mr. Jossart maintained he was entitled to compensation through a brief Ms. Strait signed. Pet'r's Pre-hearing Br., filed Aug. 31, 2020. For diagnosis, Mr. Jossart relied upon the reports from Dr. Chelimsky. For example, Mr. Jossart asserted: "The POTS diagnosis was made by Dr. [Gisela] Chelimky, a frequent author of POTS related literature." Id. at 39. "Petitioner's POTS diagnosis appears based on his clinical presentation and complaints, some abnormality on his

[7] The full citations to the medical articles are found in the bibliography in the appendix to the Entitlement Decision.

initial tilt table test, and Dr. Chelimsky's experience." Id. at 40. In this context, Mr. Jossart stated: "Dr. Steinman gives deference regarding diagnosis and treatment to the treating physicians." Id., citing Exhibit 83 (Dr. Steinman's expert report). Finally, Mr. Jossart criticized the opinion from the specialist in autonomic problems whom the Secretary had retained, Dr. Gibbons. Mr. Jossart argued:

> If one assumes Dr. Gibbons is correct – that Petitioner did not suffer POTS until the time of the tilt test in January 2017 – he implies that Dr. Gisela Chelimsky, a published authority on POTS, recorded an incorrect diagnosis in medical records for nearly five years and treated Petitioner with prescription medication for a condition Petitioner supposedly did not have until almost five years later.

Id. at 42. Mr. Jossart concluded the section of his brief regarding diagnosis by stating: "Based on Petitioner's medical records alone, evidencing diagnosis and treatment of POTS since December 2012, there is preponderant evidence that POTS is the correct diagnosis. This fact is corroborated by Dr. Steinman and simply confirmed base[d] on Petitioner's January 2017 testing." Id. at 43.

The Secretary disputed Mr. Jossart's entitlement to compensation. Resp't's Pre-hearing Br., filed Jan. 13, 2021. The Secretary challenged Mr. Jossart's claim that he suffered from POTS before 2017 and relied upon the opinions from Dr. Gibbons. Id. at 34-36. In this regard, the Secretary discussed Dr. Chelimsky's diagnosis of "borderline POTS." The Secretary also argued that "Dr. Steinman does not offer an independent opinion as to whether petitioner actually has POTS, and he makes very clear he is adopting Dr. Chelimsky's statement that petitioner has "borderline POTS." Id. at 36, citing reports from Dr. Steinman.

After the Secretary contested the significance of Dr. Chelimsky's "borderline POTS," Ms. Strait sought Dr. Chelimsky's participation in the litigation. See time entries for Feb. 5, 2021; Apr. 13, 2021; May 5, 2021.[8] Ms. Strait later explained that Dr. Chelimsky's employer did not permit her to discuss cases in litigation.

Mr. Jossart defended his position. Pet'r's Pre-hearing Reply, filed Feb. 25, 2021. With respect to diagnosis, Mr. Jossart stated: "Dr. Gisela Chelimsky is one of Petitioner's primary treaters for his POTS and gastrointestinal issues; she originally diagnosed Petitioner with POTS." Id. at 3. "Dr. Gisela Chelimsky made the diagnosis of POTS in Petitioner, albeit 'borderline POTS,' in late 2012 after his first HPV vaccination." Id. at 4, citing Exhibit 31.3 at 50. Mr. Jossart argued:

> Petitioner was, however, diagnosed by appropriate specialists who are published and recognized experts in the area of autonomic disorders. Dr. Gisela Chelimsky focuses on pediatric patients, which Petitioner was at the time of this injury, and her biography and publications show autonomic disorders, specifically POTS, are

[8] "Time entries" refers to the fees invoice submitted as Exhibit 115 in support of Mr. Jossart's motion for attorneys' fees and costs.

> her areas of interest and expertise. Although the Court is not required to accept the diagnosis of a treating physician, the Court will set a dangerous standard invalidating the diagnosis of treating physicians with relevant expertise in favor of a medicolegal expert who has never examined nor treated Petitioner as a patient.

Id. at 6 (footnote omitted).

Upon review of this material, the undersigned determined that a hearing was appropriate. Due to commitments, a mutually convenient time for a three-day hearing was delayed until March 2022. Order, issued May 11, 2021. During the pretrial status conference, Ms. Strait stated that for diagnosis, Dr. Steinman was deferring to the opinions of Dr. Chelimsky.

During his oral testimony, Dr. Steinman recognized Dr. Chelimsky as “an acknowledged expert in the field.” Tr. 225. Dr. Steinman also accurately stated that Dr. Chelimsky described Mr. Jossart as having borderline POTS. Tr. 235, 246. When asked whether he had an opinion regarding the POTS diagnosis independent of Dr. Chelimsky’s opinion, Dr. Steinman testified “My opinion is exactly the same as Dr. Chelimsky’s.” Tr. 239.

**B. From Hearing to Entitlement Decision**

The three-day hearing ended on March 24, 2022. Within about one week, Ms. Strait emailed Dr. Chelimsky again to see whether she could assist in the litigation. See time entries for Mar. 30, 2022; Apr. 18, 2022.

An order for post-hearing briefs issued on August 19, 2022. This order asked specific questions, including questions about diagnosis. This order also stated that the “evidentiary record is closed.” Although the August 19, 2022 order closed the evidentiary record, Ms. Strait persisted in her attempts to obtain more information from Dr. Chelimsky. See time entry for Sep. 21, 2022.

Without obtaining more information from Dr. Chelimsky, Ms. Strait responded to the questions posed in the August 19, 2022 order. On behalf of Mr. Jossart, Ms. Strait emphasized the material from Dr. Chelimsky. “Dr. Gisela Chelimsky recorded diagnoses of borderline POTS and POTS starting in January 2013, without Petitioner meeting the criteria of elevation of at least 40 beats per minute on a tilt table test.” Pet’r’s Post-Hearing Br., filed Nov. 17, 2022, at 4, citing Exhibit 1 at 59.

After the submission of Mr. Jossart’s post-hearing brief but before the submission of the Secretary’s post-hearing brief, Ms. Strait communicated with Dr. Chelimsky. See time entries for Jan. 3, 2023; Jan. 11, 2023; Jan. 30, 2023; Feb. 9, 2023.

The Secretary, again, challenged the assertion that Mr. Jossart suffered from POTS in 2012 or 2013. The Secretary brought forward the disparity in qualifications regarding POTS for Dr. Steinman and Dr. Gibbons. The Secretary also argued that Dr. Chelimsky’s diagnosis of “borderline POTS” was not sufficient. See Resp’t’s Post-Hearing Br., filed Feb. 21, 2023, at 2-19.

Ms. Strait continued communications with Dr. Chelimsky after the Secretary's brief. See time entries for Mar. 8, 2023 (seeking diagnosis opinion); Mar. 27, 2023; Apr. 6, 2023. Around this time, Ms. Strait wrote Mr. Jossart's post-hearing reply, which was filed on April 11, 2023. Consistent with other submissions, Mr. Jossart stated that he "reasonably relies on Dr. Gisela Chelimsky's diagnosis of his worsening dysautonomia, characterized as borderline POTS, which was subsequently diagnosed through formal tilt-table testing in 2017 that was merely a continuation of his treatment, not a new investigation of symptoms." Pet'r's Post-hearing Reply, filed Apr. 11, 2023, at 3. Mr. Jossart concludes: "Petitioner maintains he provides by preponderant evidence that he suffered a significant aggravation of his dysautonomia, diagnosed as POTS by Dr. Gisela Chelimsky in early 2013 and confirmed by tilt-table test in early 2017, due to an aberrant autoimmune response to his 2012 and 2013 HPV vaccinations." Id. at 8.

After Mr. Jossart's reply was filed, Ms. Strait corresponded more with Dr. Chelimsky. See time entries for Apr. 17-18, 2023 (multiple entries); May 11, 2023; July 10, 2023. Dr. Chelimsky provided a statement to Ms. Strait in June 2023. After soliciting and receiving the statement, Ms. Strait also informed Mr. Jossart that they could not use Dr. Chelimsky's opinion after the trial. Time entry for July 17, 2023.

*Dr. Chelimsky's June 2023 Statement*

In the statement provided to Ms. Strait, Dr. Chelimsky summarized in about four paragraphs her medical records recounting Mr. Jossart's history. Dr. Chelimsky wrote: "He did not show any evidence of POTS in 2013. He had orthostatic intolerance . . . but he did not meet criteria for POTS." Exhibit 121 at 1. Continuing to discuss Mr. Jossart's progression of symptoms, Dr. Chelimsky stated: "he did not have POTS even after the 2nd HPV vaccine, but he had already what [the National Institute of Health] calls chronic overlapping pain condition." Id.

Dr. Chelimsky commented about possible etiologies. She wrote: "It is possible, just based on timing, that the HPV vaccine could have worsened his symptoms. The HPV vaccine did not trigger the COPC [likely "chronic overlapping pain conditions"]. . . . It is unclear exactly when he developed POTS sometime between 2013 when the test did not show it, and 2017 when it did." Id. 1-2.

In a later brief, Mr. Jossart agrees that Dr. Chelimsky's June 2023 statement "confirms Petitioner did not meet the diagnostic criteria for POTS in 2012 or 2013." Pet'r's Resp., filed Oct. 16, 2025. Although Ms. Strait received the letter in June 2023, she did not submit the letter until approximately two years later when questions about the letter arose during adjudication of the motion for attorney's fees and costs. Order, issued Sept. 16, 2025.

Without the benefit of Dr. Chelimsky's June 2023 statement, the undersigned reviewed the evidence. Mr. Jossart was found not entitled to compensation in an opinion that was more than 60 single-spaced pages. Entitlement Decision, issued May 22, 2024. Approximately 10 pages were devoted to addressing whether Mr. Jossart established with preponderant evidence that he suffered from POTS. The Entitlement Decision found that Mr. Jossart had not met his burden on this element.

Following the Entitlement Decision, Ms. Strait and another attorney considered whether to challenge the outcome by filing a motion for review. See time entries for May 23-31, 2024. Ultimately, a motion for review was not filed.

Acting through Ms. Strait, Mr. Jossart requested that the Entitlement Decision be redacted. However, this motion was denied. Order, issued July 23, 2024. Mr. Jossart's legal team considered whether to challenge the denial of redaction. See time entries for July 31, 2024-Aug. 1, 2024. Ultimately, a motion for review regarding redaction was not filed.

### C. Attorneys' Fees

Mr. Jossart sought an award of his reasonable attorneys' fees and costs via the pending amended motion filed on December 26, 2024. This motion was supported by Exhibits 115-20. The supporting exhibits included a declaration dated December 24, 2024, in which Ms. Strait disclosed that after the hearing, she spoke to Dr. Chelimsky, who had requested "a modest but usual consultation fee to review her distant records." Exhibit 118 ¶ 25. *After receiving a statement from Dr. Chelimsky*, Ms. Strait "determined this information was not germane to Petitioner's evidentiary burden in the VICP [Vaccine Injury Compensation Program] and a strategic decision was made to not seek or submit testimony from her in Petitioner's case." Id.

The Secretary did not object to any aspect of Mr. Jossart's fees motion. Instead, the Secretary deferred to the assessment of the special master. Resp't's Resp., filed Jan. 23, 2025. On the same day, Mr. Jossart requested the amount proposed in his amended motion. Pet'r's Reply, filed Jan. 23, 2025.

Consistent with McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018), the undersigned reviewed Mr. Jossart's request for attorneys' fees and costs. This review raised questions about various items, including Ms. Strait's possession of a statement from Dr. Chelimsky. Thus, a status conference, which was recorded, was held on July 30, 2025.

Ms. Strait appeared at the status conference. Debra Filteau Begley, who has represented the Secretary throughout the case, also appeared.

Ms. Strait stated that she did not file Dr. Chelimsky's statement because "it wouldn't have gotten petitioner anywhere." Status Conference Recording 35:36-35:56.[9] If this is taken to mean that Dr. Chelimsky's statement would not have moved the case one way or the other, this explanation is, in some respects, similar to Ms. Strait's December 24, 2024 declaration. There, Ms. Strait averred that she did not submit Dr. Chelimsky's statement because it was "not germane" to Mr. Jossart's claim for compensation. Exhibit 118 ¶ 25. In the status conference, Ms. Strait also stated that Dr. Chelimsky's June 2023 statement was "equally as muddy" about diagnosis as her medical records had been. Status Conference Recording 39:59-40:15. On the other hand, this characterization of Dr. Chelimsky's statement as not getting petitioner anywhere

[9] A transcript of the July 30, 2025 status conference has not been ordered. Thus, this decision cites to timestamps from the audio file retained by the Court. The parties may still order a certified transcript of the status conference.

could be taken to mean that Ms. Strait did not file the statement because it would not have been *helpful* to Mr. Jossart – not because it lacked relevance.

In both the declaration and in the July 30, 2025 status conference, Ms. Strait did not claim any privilege. Actually, in the July 30, 2025 status conference, Ms. Strait stated, "I don't think it's protected by any privilege." Status Conference Recording 35:00. Thus, Ms. Strait offered to file the statement. Id.

When asked about whether Dr. Chelimsky's statement constituted a medical record, Ms. Strait stated that it was not. To her, medical records are created for treatment. Because Dr. Chelimsky created this letter for purposes of litigation, it was not a medical record. Status Conference Recording 41:05-42:15. The argument that Dr. Chelimsky's statement was not a medical record was not part of Ms. Strait's declaration. See Exhibit 118.

Following the status conference, Mr. Jossart was directed to file all communications with Dr. Chelimsky. Mr. Jossart was also instructed to file a brief regarding the decision not to submit Dr. Chelimsky's June 2023 statement. Finally, the Secretary was directed to provide his views as to whether Dr. Chelimsky's June 2023 statement should have been produced in June 2023. Order, issued Sep. 16, 2025.

Mr. Jossart complied with the order to produce material, eventually. Initially, Mr. Jossart produced redacted copies of emails between Ms. Strait and Dr. Chelimsky. Exhibits 124-25. In the submission, Mr. Jossart did not propose any reason for the redactions. After the Secretary commented upon this situation (see Resp't's Resp., filed Oct. 30, 2025), Mr. Jossart was directed either to justify the redactions or to produce unredacted copies. Mr. Jossart did the latter. Unredacted emails between Ms. Strait and Dr. Chelimsky are contained as Exhibits 127-28.

The parties also argued about whether Mr. Jossart was required to produce Dr. Chelimsky's June 2023 statement. Still acting as counsel of record for Mr. Jossart, Ms. Strait argued that petitioner was not required to produce Dr. Chelimsky's June 2023 statement. Pet'r's Resp., filed Oct. 16, 2025. The crux of the argument is that (a) the Vaccine Act and the Vaccine Rules require the production of medical records and (b) Dr. Chelimsky's June 2023 statement is not a medical record. Id. at 9-12. This justification was not offered in Ms. Strait's December 24, 2024 declaration but was a point during the July 30, 2025 status conference. A secondary argument was that because Dr. Chelimsky's June 2023 statement was not a medical record (and therefore not required to be filed), the production of it "would have presented cumulative evidence, caused unnecessary confusion, . . . did not prejudice Respondent in light of other evidence in the record, and would have amounted to delay and waste of VICP resources." Pet'r's Resp., filed Oct. 16, 2025, at 12. The arguments presented in this Response parrot assertions Ms. Strait made in a supplemental declaration, dated October 16, 2025. See Exhibit 123.

The Secretary disagreed, contending that Mr. Jossart was required to produce Dr. Chelimsky's June 2023 statement. Resp't's Resp., filed Oct. 30, 2025. In the Secretary's view, Dr. Chelimsky's June 2023 statement was a "'physician note' that falls squarely within the type of evidence petitioner is required to file under the Act, and because it would have corrected petitioner's prior representations to the Court that Dr. Chelimsky had diagnosed him with POTS

in 2012 and 2013." Id. at 4. The Secretary emphasized the prominent role Dr. Chelimsky's opinion regarding "borderline POTS" played in Mr. Jossart's arguments. See id. at 6-9 (citing various submissions by Dr. Steinman and Mr. Jossart's attorney). The Secretary also argued that petitioners in the Vaccine Program cannot "withhold potentially relevant evidence, on the basis that it would 'cause confusion.'" Id. at 10. Finally, the Secretary remarked that petitioners in the Vaccine Program cannot "withhold potentially relevant evidence, on the basis that doing so would 'not prejudice' respondent." Id. at 11.

Around this time, Ms. Strait, who had been managing partner for her law firm, departed from the firm. Jennifer Maglio became counsel of record for Mr. Jossart. See Pet'r's Mot. to Substitute, filed Oct. 21, 2025.

Thus, Ms. Maglio---not Ms. Strait---signed Mr. Jossart's answer to the Secretary's arguments. Pet'r's Reply., filed Dec. 5, 2025. A basic point is that, according to Ms. Maglio, "Whether viewed through the lens of vaccine law or medical requirements, Dr. Chelimsky's letter does not meet the definition of a medical record. . . . As it was not a medical record, Dr. Chelimsky's letter, which is best viewed as a consulting expert letter, was not required to be filed in this matter." Id. at 1-2. A substantial portion was devoted to discussing whether treating doctors are required to have their opinions disclosed via a report disclosed during discovery before testifying at a trial. Id. at 10-15.

The argument that Dr. Chelimsky was acting as a consulting expert had not been raised in Ms. Strait's initial declaration, nor by Ms. Strait during the July 30, 2025 status conference, nor in Mr. Jossart's October 16, 2015 Response. As such, the argument could have been struck. SmithKline Beecham, Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006). Instead, the Secretary was given an opportunity to respond. Order, issued Dec. 9, 2025.

The Secretary maintained that Dr. Chelimsky's June 2023 statement should have been produced in June 2023. The Secretary addressed the most recent arguments as to whether this statement constituted a medical record. The Secretary also contended that cases distinguishing treating doctors from consulting experts under Federal Rule of Civil Procedure 26 do not justify failing to disclose Dr. Chelimsky's statement because discovery in the Vaccine Program is different. Resp't's Resp., filed Jan. 12, 2026.

An oral argument was held on June 3, 2026.[10] With the oral argument, the case is ready for adjudication.

## III. Analysis Part One: Attorneys' Fees and Costs before June 2023

### A. Eligibility for Attorneys' Fees and Costs

Petitioners who have not been awarded compensation (like Mr. Jossart here) are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa-15(e)(1). As the Federal Circuit has

[10] To distinguish the oral argument transcript from other transcripts, the oral argument transcript begins on page 2001.

stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Hum. Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

Here, there is no dispute that Mr. Jossart satisfied both the good faith and reasonable basis standards up until Ms. Strait received Dr. Chelimsky's June 2023 statement. See Resp't's Resp., filed Jan. 23, 2025, at 2 ("Respondent is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case"). Although special masters retain discretion whether to award (or to deny) attorneys' fees and costs when there are good faith and reasonable basis, Mr. Jossart's case was relatively routine through June 2023. Thus, an award of reasonable attorneys' fees and costs will be made.

**B. Reasonable Attorneys' Fees**

Under the Vaccine Act, a special master may award reasonable attorneys' fees and costs. 42 U.S.C. § 300aa-15(e)(1). The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. This is a two-step process. Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008). First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348. Here, because the lodestar process yields a reasonable result, no additional adjustments are required. In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness. See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

1. Reasonable Hourly Rate

The law firm was first contacted in 2013. In that year, Ms. Strait and Mr. Caldwell charged $300.00 per hour. Some staff at the law firm charged $95.00 per hour. In December 2024, which is shortly before the fee application was filed, Ms. Strait charged $480.00 per hour and paralegals charged $190 per hour. Other attorneys and paralegals charged different hourly rates during different years.

The vast majority of hourly rates are within the bounds that special masters have previously accepted as reasonable. The few exceptions, such as Ms. Maglio's hourly rate in 2022, are close to de minimis. Thus, the hourly rates are credited as reasonable.

2. Reasonable Number of Hours

Reasonable hours are not excessive, redundant, or otherwise unnecessary. See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993). Special masters may look to their experience and judgement to reduce the number of hours billed to a level they find reasonable for the work performed. Saxton ex rel. v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).

Most of the activities were adequately documented and the time spent on those activities was reasonable. Thus, almost all hours are credited. However, a few items merit discussion.

*a) Attorney Travel*

In 2014, Mr. Caldwell traveled to meet Mr. Jossart and his parents. See Exhibit 115 at 5-6 and Exhibit 116 at 2. Ms. Strait stated that Mr. Caldwell split the cost for this trip with another case. Status Conference Recording 7:16-10:15.

In 2015, Mr. Caldwell traveled to meet Dr. Steinman. Ms. Strait explained that the trip was split among two or three other cases. Status Conference Recording 10:15-14:26.

The reasonableness of an attorney flying to meet a client at the start of the case is not apparent. In the undersigned's experience, nearly all attorneys in the Vaccine Program successfully and professionally represent their clients without meeting them in person. This experience leads to the conclusion that travel for an in-person meeting is not essential to the attorney-client relationship. It is not readily clear that if Mr. Jossart were required to pay for Mr. Caldwell's travel time and expenses, Mr. Jossart would have endorsed these expenditures.

An attorney's travel to meet with an experienced expert seems even less reasonable. Although Ms. Strait stated that Mr. Caldwell wanted to meet with Dr. Steinman because his theory of how the vaccine caused an injury was complex, Dr. Steinman's theory of molecular mimicry had been presented by him many times even before 2015.

Nevertheless, all the attorney time is credited primarily for two reasons. First, because the law firm divided the costs for the trips among different cases, the amount of money requested is relatively small. Second, and potentially relatedly, the Secretary did not interpose any objection to this item. See Vaccine Rule 13(a)(3).[11]

*b) Clerical Activities*

Attorneys should not charge for clerical tasks. See Guerrero v Sec'y of Health & Human Servs., No. 12-689V, 2015 WL 3745354, at *6 (Fed. Cl. Spec. Mstr. May 22, 2015) (citing cases), mot. for rev. den'd in relevant part and granted in non-relevant part, 124 Fed. Cl. 153, 160 (2015), app. dismissed, No. 2016-1753 (Fed. Cir. Apr. 22, 2016).

Here, paralegals charged for obtaining medical records, which is a legitimate and chargeable paralegal task. However, some entries, especially when the case began in 2013, are vague about from whom the records were being sought. Ms. Strait recognized that entries from around that time were more generic than recent entries from paralegals. More significantly, tasks

[11] During the Covid pandemic, everyone became more comfortable using videoconferencing technologies. Thus, travel for relatively routine meetings may not be compensable. See Thomas v. Sec'y of Health & Human Servs., No. 18-1948V, 2023 WL 2155057, at *3 (Fed. Cl. Spec. Mstr. Feb. 22, 2023).

such as filing documents and Bates-stamping should not be charged at all. Thus, $2,000.00 is deducted.

*c) Time Spent Preparing the Fee Application*[12]

The Federal Circuit has endorsed awards of attorneys' fees for litigating fee disputes. Schuenemeyer v. United States, 776 F.2d 329, 333 (Fed. Cir. 1985). Special Masters have generally allowed "fees for fees," albeit with reductions consistent to maintain the reasonableness of any particular request. See Turkupolis v. Sec'y of Health & Human Servs., No. 10-351V, 2015 WL 393343, at *4-5 (Fed. Cl. Spec. Mstr. Jan. 9, 2015) (reducing fees for duplicative and excessive work); Sucher v. Sec'y of Health & Human Servs., No. 07-58V, 2013 WL 5532179, at *18 (Fed. Cl. Spec. Mstr. Sept. 17, 2013) (not compensating petitioners for time spent litigating an issue for which there was no basis to litigate); Brown v. Sec'y of Health & Human Servs., No. 09-426V, 2013 WL 2350541, at *2-3 (Fed. Cl. Spec. Mstr. May 6, 2013) (reducing fees for fees by two-thirds based on two out of three of the primary issues in petitioner's filings being unreasonable). An uncomplicated fee application may be processed in approximately four hours. Savin v. Sec'y of Health & Human Servs., No. 99-537V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008), mot. for rev. denied, 85 Fed. Cl. 313 (2008).

Here, Mr. Jossart seeks reimbursement for approximately 20 hours of paralegal time plus approximately 10-11 hours of Ms. Strait's time. Exhibit 115 at 56-59; Status Conference Recording 46:37-48:00. In other words, approximately one-half of the paralegal's standard 40-hour workweek plus more than one full (eight-hour) day for Ms. Strait was spent preparing the fee application.

This much time is excessive, even given the duration of the litigation. One problem is that many time entries do not explain what, specifically, is being done to prepare the fee application. For example, a common entry is "Continued review of attorney fees in preparation of motion for fees and costs." In the status conference, Ms. Strait explained that at least some time was spent on clarifying the time entries. But the fact that original time entries required clarification suggests that the original time entries should have been better to start. Generally, attorneys should not seek to charge clients for problems that the attorneys have created. See Garcia v. Sec'y of Health & Human Servs., No. 07-286V, 2011 WL 6941702, at *10 (Fed. Cl. Spec. Mstr. Dec. 13, 2011) (not compensating an attorney for work necessitated by a problem the attorney created).

[12] Although technically the fee submission was made after Ms. Strait received Dr. Chelimsky's statement in June 2023, the receipt of Dr. Chelimsky's statement does not materially affect the fee submission. Mr. Jossart would have sought his attorneys' fees and costs regardless. Likewise, the law firm spent a small amount of time wrapping up the case and these activities would have happened regardless. Thus, Mr. Jossart is being reimbursed for these activities to wind down the case in full, which amounts to less than $500.00.

Under these circumstances, the time spent on the fee application is reduced by half. This results in a deduction of $4,300.00.[13]

3. Summary for Reasonable Attorneys' Fees before June 2023

| | |
|---|---|
| Original Fee Request | $283,643.30 |
| Deduction for Activities after June 1, 2023 except time spent on wrapping up the case and requesting fees | $10,675.00 |
| Deduction for Excessive Time spent on Fee Application | $4,300.00 |
| Deduction for Clerical Activities | $2,000.00 |
| Reasonable Attorneys' Fees before June 1, 2023 | $266,668.30 |

**C. Costs**

Petitioners who are eligible for awards of reasonable attorneys' fees, like Mr. Jossart, are also eligible for awards of reasonable costs. 42 U.S.C. § 300aa–15(e); Perreira

Here, for activities performed before June 1, 2023, Mr. Jossart seeks an award of $52,014.78. See Exhibit 116 at 4. Many items are for seeking medical records and these items are adequately documented, reasonable, and credited in full. Some items are the costs associated with Mr. Caldwell's travel to visit the Jossart family and to meet with Dr. Steinman in person. Again, the reasonableness of these trips is debatable but because, in part, the law firm split the costs with other cases, these costs are also reimbursable.

The bulk of the requested costs concern Dr. Steinman's work. Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).

Here, Dr. Steinman was retained in 2015 and began work in 2016. Exhibit 116 at 119 (Dr. Steinman's first invoice, dated Mar. 21, 2021, showing 32.75 hours). His work finished after he testified in the hearing in March 2022. Id. at 133 (Dr. Steinman's second invoice, dated June 2, 2022, showing 44.25 hours).[14] Overall Dr. Steinman spent 77 hours. He has charged $550.00 per hour for all his time.

Although Dr. Steinman spent a reasonable number of hours, his proposed hourly rate is excessive, at least in part. When Dr. Steinman was performing most of his work, special masters were compensating Dr. Steinman at a rate of $500.00 per hour. See L.R. by & through Baxter v. Sec'y of Health & Hum. Servs., No. 16-922V, 2023 WL 2320342 (Fed. Cl. Spec. Mstr. Mar. 2,

---

[13] Ten hours of the paralegal's time at a rate of $190.00 per hour plus five hours of Ms. Strait's time at a rate of $480.00 per hour.

[14] Although Dr. Steinman's invoice suggests that the hearing was held in 2021, the hearing was held in 2022.

2023); Status Conference Recording 52:00-55:44. Special masters may not adjust the amount of compensation due to a delay in payment. Awards of attorneys' fees and costs are based upon the reasonableness of the expense when the activity is performed, not when it is paid. Awards that account for delay in payment, such as awards of interest, violate sovereign immunity. Avera v. Sec'y of Health & Hum. Servs., 75 Fed. Cl. 400, 405 (2007), aff'd in part and rev'd in part on non-related grounds, 515 F.3d 1343 (Fed. Cir. 2008); Pestka v. Sec'y of Health & Hum. Servs., No. 06-708, 2011 WL 4433634, at *5 (Fed. Cl. Spec. Mstr. Aug. 30, 2011).

For ease of simplicity, the 32.75 hours from the first invoice will be compensated at a rate of $500.00 per hour (not $550.00 per hour). This results in a reduction of $1,637.50. The 44.25 hours from the second invoice will be credited at $550.00 per hour.

Accordingly, for work performed before June 1, 2023, a reasonable amount of attorneys' costs is $50,377.28. In addition, Mr. Jossart seeks reimbursement for costs that he incurred in the amount of $55.61. Exhibit 117. This request is reasonable as well. Consequently, the total amount awarded in costs is $50,432.89.

### D. Conclusion for Attorneys' Fees and Costs before June 1, 2023

For the work that was not affected by Ms. Strait's receipt of Dr. Chelimsky's June 2023 statement, a reasonable amount of attorneys' fees and costs is $317,101.19.

## IV. Analysis Part Two: Attorneys' Fees and Costs after June 2023

The analysis through this point has been relatively routine. In short, although Mr. Jossart brought an unsuccessful claim, some evidence supported his claim. Therefore, he was eligible to be reimbursed for his reasonable attorneys' fees and costs. With a few exceptions discussed above, the proposed amounts are reasonable.

However, after Ms. Strait received Dr. Chelimsky's June 2023 statement, the case is no longer relatively routine. Instead, two questions arise. The first is: did Ms. Strait have any obligation to file Dr. Chelimsky's June 2023 statement? The second is: how would the submission of the June 2023 statement affect the remainder of the case?

### A. Obligation to File Dr. Chelimsky's June 2023 Statement

The preliminary issue is whether Ms. Strait was required to file the statement from Mr. Jossart's former doctor, Dr. Chelimsky, when she received it in June 2023. This issue is preliminary in the sense that if Ms. Strait were permitted to obtain information about her client and not file that information, then the evidentiary record would remain the same.

After Mr. Jossart filed his motion for attorneys' fees and costs, which revealed that Ms. Strait had obtained a statement from Dr. Chelimsky, and after the July 30, 2025 status conference, during which Ms. Strait offered to file Dr. Chelimsky's statement, Mr. Jossart filed the statement as Exhibit 121. After reviewing the statement, the Secretary contended that Mr. Jossart should have filed the statement. Resp't's Resp., filed Oct. 30, 2025. Mr. Jossart maintained that he was not required to file the statement. Pet'r's Reply, filed Dec. 5, 2025.

The main dispute is whether Dr. Chelimsky's statement constitutes a medical record. In characterizing this issue as the main dispute, the undersigned can easily dismiss some arguments that Ms. Strait advanced in her response to the September 16, 2025 order. There, on behalf of her client, Ms. Strait argued that she was not required to inform the Secretary or the undersigned about Dr. Chelimsky's June 2023 statement because filing the statement would cause confusion and because its absence would not prejudice the Secretary. Pet'r's Resp., filed Oct. 16, 2025, at 12. Neither of the arguments are remotely credible. As to the argument that Dr. Chelimsky's June 2023 statement would cause confusion, Dr. Chelimsky's June 2023 statement would cause "confusion," only in the sense that Dr. Chelimsky's June 2023 would have eliminated any chance that Mr. Jossart could prevail on his claim that the November 26, 2012, and January 8, 2013, HPV vaccines significantly aggravated underlying POTS. As to whether Mr. Jossart suffered from POTS in 2012 or 2013, Dr. Chelimsky was far from confusing. Dr. Chelimsky wrote: Mr. Jossart "did not show any evidence of POTS in 2013." Exhibit 121 at 1. Dr. Chelimsky acknowledges that Mr. Jossart experienced "symptoms while upright, but he did not meet the criteria for POTS." Id. What is confusing about these statements?

Likewise, Mr. Jossart did not credibly support an argument that assessing one party's obligation to produce material depends upon whether the lack of production would prejudice the other party. When given a chance to respond to the Secretary's challenge, Mr. Jossart, who was then represented by Ms. Maglio, did not defend the arguments regarding confusion or no prejudice. See Pet'r's Reply, filed Dec. 5, 2025. Instead, Ms. Maglio continued to argue that Dr. Chelimsky's June 2023 statement was not a medical record.

The parties' focus on the question as to whether Dr. Chelimsky's June 2023 statement is a medical record stems from the Vaccine Act. In creating the Vaccine Program, Congress modified the way information is exchanged in traditional litigation. Congress mandated that petitioners submit various documents including: "post-injury physician or clinic records . . . all . . . outpatient records (including all provider notes, tests results, and medication records)." 42 U.S.C. § 300aa–11(c)(2). The legislative history of the Vaccine Act shows that Congress "intend[ed] for the parties and the court to construe this provision broadly so as to require the submission of a meaningful file of information." H.R. CONF. REP. No. 101-386, at 514-15 (1989), as reprinted in 1989 U.S.C.C.A.N. 3018, 3117-18.

It appears that because Congress had directed petitioners to file medical records, Congress expected that litigation in the Vaccine Program would be "less adversarial." 42 U.S.C. § 300aa–12(d)(2)(A). Consistent with this Congressional directive, the judges of the Court of Federal Claims promulgated the Vaccine Rules that specify "There is no discovery as a matter of right." Vaccine Rule 7(a).

Here, at least at the inception of the case, Mr. Jossart complied with an obligation to produce medical records from many people, including Dr. Chelimsky. Mr. Jossart offers various explanations for why he was not required to file Dr. Chelimsky's statement upon receipt in June 2023. Arguments include a lack of relevance, that Dr. Chelimsky's statement was not a medical record, that Ms. Strait retained Dr. Chelimsky as a consultant in the litigation, and that the Secretary waived his right to obtain the information. However, as discussed below, none of these justifications are persuasive.

1. **Relevance**

Originally, Ms. Strait asserted that Dr. Chelimsky's statement was "not germane to Petitioner's evidentiary burden . . . and a strategic decision was made to not seek or submit testimony from her." Exhibit 118 ¶ 25. This argument is, in a word, preposterous. Although Ms. Strait has been a respected member of the bar for years, it is difficult to see any credibility in this argument. In briefs authored by Ms. Strait, Mr. Jossart consistently relied upon Dr. Chelimsky to show preponderantly that he suffered from POTS. Arguments made by Ms. Strait include the following:

- "The POTS diagnosis was made by Dr. [Gisela] Chelimsky, a frequent author of POTS related literature." Pet'r's Pre-Hearing Br., filed Aug. 31, 2020 at 39;
- "Based on Petitioner's *medical records alone*, evidencing diagnosis and treatment of POTS since December 2012, there is preponderant evidence that POTS is the correct diagnosis. Id. at 43 (emphasis added);
- "Dr. Gisela Chelimsky is one of Petitioner's primary treaters for his POTS and gastrointestinal issues; she originally diagnosed Petitioner with POTS." Pet'r's Pre-hearing Reply, filed Feb. 25, 2021, at 3;
- "Dr. Gisela Chelimsky recorded diagnoses of borderline POTS and POTS starting in January 2013, without Petitioner meeting the criteria of elevation of at least 40 beats per minute on a tilt table test." Pet'r's Post-Hearing Br., filed Nov. 17, 2022, at 4;
- "Petitioner maintains he provides by preponderant evidence that he suffered a significant aggravation of his dysautonomia, diagnosed as POTS by Dr. Gisela Chelimsky in early 2013 and confirmed by tilt-table test in early 2017." Pet'r's Post-Hearing Reply, filed Apr. 11, 2023, at 8.

But the Secretary disagreed. Resp't's Pre-hearing Br., filed Jan. 13, 2021, at 34-36; Resp't's Post-Hearing Br., filed Feb. 21, 2023, at 2-19. Thus, Dr. Chelimsky's view on the appropriateness of POTS as a diagnosis was an issue at the front and in the center of Mr. Jossart's case.

Dr. Chelimsky's statement addressed diagnosis. She spoke directly:

- "He did not show any evidence of POTS in 2013."
- "He did not have POTS even after the 2nd HPV vaccine."
- "It is unclear exactly when he developed POTS sometime between 2013 when the test did not show it, and 2017 when it did."

Exhibit 121.

If anything, the problem from Mr. Jossart's perspective was not that Dr. Chelimsky's statement lacked relevance; it was actually *too* relevant. See Pet'r's Resp., filed Oct. 16, 2025, at 7 (Dr. Chelimsky's statement "confirms Petitioner did not meet the diagnostic criteria for POTS in 2012 or 2013"). By saying that Mr. Jossart did not have POTS in 2012 or 2013, Dr.

Chelimsky effectively cut the legs out from the claim that the vaccines significantly aggravated POTS in Mr. Jossart. See Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010).

To the extent that Ms. Strait averred that Dr. Chelimsky's letter "confirmed what was readily apparent in the record from medical records and Dr. Gibbons' testimony – that Petitioner did not meet the diagnostic criteria for POTS," Exhibit 123 (Ms. Strait's affidavit) ¶ 12.a, that assertion is inconsistent with the points in briefs authored by Ms. Strait that argue that Dr. Chelimsky diagnosed Mr. Jossart with POTS. Ms. Strait cannot have it both ways—she cannot argue that Dr. Chelimsky diagnosed Mr. Jossart with POTS and claim that a statement in which Dr. Chelimsky says that Mr. Jossart did not have POTS is not relevant.

Accordingly, Ms. Strait's contention that she was not required to produce Dr. Chelimsky's statement on the ground that the statement lacks relevance is rejected.[15]

2. Medical Records

Although Ms. Strait originally declared that she did not produce Dr. Chelimsky's statement because it was "not germane," (Exhibit 118 ¶ 25), Ms. Strait developed a new argument presented for the first time in the July 30, 2025 status conference. Then, Ms. Strait argued that Dr. Chelimsky's statement is not a medical record. Status Conference Recording 41:05-42:15. Ms. Strait developed her position more formally. Pet'r's Resp., filed Oct. 16, 2025, at 9-11; Exhibit 123 (Ms. Strait's affidavit, filed Oct. 16, 2025) ¶ 10. Ms. Maglio shares this position. Pet'r's Reply, filed Dec. 5, 2025. The Secretary disagrees, arguing that Dr. Chelimsky's statement is a medical record. Resp't's Resp., filed Oct. 30, 2025, at 9-10.

In one respect, the question regarding medical records could be dispositive. Ms. Maglio agreed that if Dr. Chelimsky's statement is a medical record, then Ms. Strait was obligated to submit it. Tr. 2010.

In arguing that Dr. Chelimsky's statement is not a medical record, Mr. Jossart relies upon Vaccine Rule 2. See, e.g., Pet'r's Reply, filed Dec. 5, 2025, at 3. This provision states:

> ***Required Attachments.*** As required by 42 U.S.C. § 300aa—11(c), the petition must be accompanied by the following documents:
>
> ***(A) Medical Records.*** Petitioner must include a certified copy of all available medical records supporting the allegations in the petition, including physician and hospital records relating to:
>
> . . .

[15] To Ms. Maglio's credit, the briefs she wrote seem not to have advanced arguments based upon a (lack of) relevance.

> (iii) any post-vaccination treatment of the injured person, including all in-patient and out-patient records, provider notes, test results, and medication records.

Vaccine Rule 2(c)(2). Mr. Jossart emphasizes the requirement to submit records regarding "post-vaccination treatment." Pet'r's Resp., filed Oct. 16, 2025, at 9-11; Pet'r's Reply, filed Dec. 5, 2025.

In Mr. Jossart's view, petitioners are required to submit "treatment notes" but Dr. Chelimsky's statement is not a "treatment note." This argument is flawed for two reasons.

First, in focusing on Vaccine Rule 2, Mr. Jossart overlooks the Vaccine Act. As the Secretary pointed out, the Vaccine Act mandates production of "provider notes." See Resp't's Resp., filed Oct. 30, 2025, at 5. The Vaccine Act provides:

> A petition for compensation under the Program for a vaccine-related injury or death shall contain—
>
> . . .
>
> (2) . . . pre- and post-injury physician or clinic records (including all relevant provider notes, test results, and medication records).

42 U.S.C. § 300aa—11(c). Unlike the Vaccine Rules, the Vaccine Act does not use the term "treatment." See Resp't's Resp., filed Jan. 12, 2025, at 2. The Vaccine Act requires the production of "post-injury physician . . . records" and "provider notes" without limiting physician records or "provider notes" to records associated with "treatment." If Congress had intended to limit petitioners' requirement to produce medical records associated with "treatment," Congress could have included the word "treatment" in the Vaccine Act. 42 U.S.C. §300aa-11(c)(2); see W.J. by R.J. v. Sec'y of Health & Hum. Servs., 93 F.4th 1228, 1241 (Fed. Cir. 2024) (holding that the "lack of any statutory provision providing for minority tolling is conclusive proof that Congress did not intend to provide for such tolling); Beck v. Sec'y of Health & Hum. Servs., 934 F.2d 1029, 1034 (Fed. Cir. 1991) (a court's "duty is limited to interpreting the statute as it was enacted"); see also Kyocera Wireless Corp. v. Int'l Trade Comm'n, 545 F.3d 1340, 1356 (Fed. Cir. 2008) (citing Burlington N. R.R. Co. v. Okla. Tax Comm'n, 481 U.S. 454, 463 (1987) ("[T]he addition of words to a statutory provision which is complete as it stands ... would require amendment rather than construction of the statute, and it must be rejected here")).

Although given an opportunity to rebut the Secretary's reliance on the Vaccine Act, Mr. Jossart did not do so persuasively. See Pet'r's Reply, filed Dec. 5, 2025, at 3. Likewise, during oral argument, Ms. Maglio struggled to explain why Dr. Chelimsky's statement was not a provider note. See Tr. 2012-17.

A sense that the Vaccine Act mandates the production of treatment notes and provider notes aligns with guidance from the Office of Special Masters. The Guidelines provide:

> The statute at § 11(c) explicitly sets forth the required documents, as does Vaccine Rule 2(c). The scope of the requirements is intentionally very broad. Counsel should include all medically related records that might possibly shed light on the question of causation, including all records pertaining to the vaccination itself and postvaccination medical examination and treatment records.

Guidelines, Section II. Chap. 3 ¶ B.

When asked about the Guidelines, Ms. Maglio acknowledged that there is some "tension" between Mr. Jossart's position and the Guidelines. Tr. 2021. Ms. Maglio went on to argue that the use of the term "including," limited petitioners' obligation. Tr. 2022; see also Pet'r's Reply, filed Dec. 5, 2025, at 4 ("the Guidelines limit the medical records to be filed to postvaccination records of examination and treatment"). However, an argument that the term "including" narrows the disclosure obligations is contradicted by the remainder of the passage in which special masters have advised that the scope of disclosure requirements "is intentionally very broad." Moreover, the word "including" is generally considered to illustrate some examples and not to be limiting. See Federal Land Bank of St. Paul v. Bismark Lumber Co., 314 U.S. 95, 99-100 (1941) ("We recently had occasion under other circumstances to point out that the term 'including' is not one of all-embracing definition, but connotes simply an illustrative example of the general principle"); Apple Inc. v. Voip-Pal.com, Inc., 976 F.3d 1316, 1323 (Fed. Cir. 2020) ("the term 'include' . . . signifies a non-exhaustive list") (citing cases).

Thus, the Vaccine Act, as supplemented by the Guidelines, mandates petitioners to produce "post-injury provider . . . reports" and "provider notes." Dr. Chelimsky provided medical services to Mr. Jossart, and her June 6, 2023 statement is either a report or a note. Thus, Ms. Strait was obligated to file it when she received it. While the finding that Dr. Chelimsky's statement is a medical record resolves the issue of whether Ms. Strait was obligated to file it, remaining points are also addressed.

As mentioned earlier, Ms. Strait and Ms. Maglio contend that Mr. Jossart's obligation to produce medical records extends only to treatment notes. Even if this interpretation were correct, the argument remains unpersuasive. Dr. Chelimsky's statement discusses her "treatment" of Mr. Jossart. She summarized the histories provided to her, repeated the diagnoses she reached ("dizziness and syncope"), and listed medications she prescribed. She determined that Mr. Jossart was not deconditioned in 2013. All these aspects are part of her treatment of Mr. Jossart. As such, the June 6, 2023 statement is a treatment note.

Arguments that Dr. Chelimsky's statement is not a treatment note are unavailing. Drawing upon several cases in which plaintiffs claimed the actions by defendants caused them personal injuries, Mr. Jossart argues that Dr. Chelimsky's statement was not a medical record. Pet'r's Reply, filed Dec. 5, 2025, at 10-14.

As a preliminary but important point, Mr. Jossart's attempt to analogize the Vaccine Program to the Federal Rules of Civil Procedure ("FRCP") in the context of producing records is awkward. Litigation in the Vaccine Program differs from litigation under Federal Rules of Civil Procedure in various ways. One significant difference is that Congress specified that the rules promulgated by the Court of Federal Claims for the Vaccine Program will "replace the usual rules of discovery in civil actions in the United States Court of Federal Claims." 42 U.S.C. § 300aa—12(d)(1)(E). Rather than adopt a traditional method of discovery in which parties propound interrogatories and requests for production of documents, Congress simplified the matter. Congress mandated petitioners to file all medical records.

By way of contrast, Federal Rule of Civil Procedure requires parties to disclose opinions from experts before an expert can testify at a hearing. Whether doctors who treated an injured plaintiff are required to author reports was considered in many cases. To resolve any tensions, FRCP 26(a)(2)(C) was revised in 2010. The rule now "mandate[s] summary disclosure of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B)." FED. R. CIV. P. 26 advisory committee's note (2010). The Advisory Committee specifically noted that "Frequent examples [of witnesses under FRCP 26(a)(2)(C)] include physicians or other health care professionals." Id. Under the amended rule, the parties "must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C)," which includes the subject matter and a summary of facts and opinions to which the expert is expected to testify. Id.; see also FRCP 26(a)(2)(C)(i)-(ii).

In determining whether plaintiffs could elicit testimony at a trial from a treating doctor, district courts considered various factors. One important factor was whether the doctor formed the opinion during treatment.[16] See, e.g., Peterson v. Ross Dress for Less, Inc., No. 4:23-CV-00020-SPM, 2023 WL 8433155, at *4 (E.D. Mo. Dec. 5, 2023) (determining that duty to disclose witness identity applied to doctor who formed opinion outside the course of treatment); Ngo v. Standard Tools & Equip., Co., 197 F.R.D. 263, 267 (D. Md. 2000) ("if the physician's opinion is based on information not learned during the course of treatment, then such testimony usually is beyond the "fact opinion" classification and must comply with the rules regarding expert disclosures").

Here, it appears that Dr. Chelimsky formed her opinion that Mr. Jossart did not suffer from POTS in 2012 or 2013 at the time she was still treating him. When contacting Dr. Chelimsky in 2022, Ms. Strait acknowledged that Dr. Chelimsky was not treating Mr. Jossart at that time but clarified that her questions about Mr. Jossart "focus on the distant past." Exhibit 127 at 7 (email, dated July 28, 2022). In the context of responding to emails from Ms. Strait, Dr. Chelimsky requested her medical records, which she no longer possessed. Exhibit 127 at 4 (email, dated Jan. 9, 2023); see also Tr. 2027 (special master's noting that Dr. Chelimsky probably could not access records from her previous practice in Wisconsin because she had moved to Virginia). Dr. Chelimsky did not request more recent records. In 2023, Dr.

[16] When the doctor formed his or her opinion is discussed further below in the context of non-testifying consultants.

Chelimsky's source of information about Mr. Jossart was the medical records created by her or maintained by her in the course of her treatment of Mr. Jossart.

To align with district court cases, which generally held a treating doctor who had not been disclosed as an expert could testify about opinions formed during treatment but not about new opinions formed after treatment, Mr. Jossart is necessarily maintaining that Dr. Chelimsky formed new opinions. See Pet'r's Reply, filed Dec. 5, 2025, at 11 ("opinions formed for purposes of litigation are not considered a part of the medical record"). Drawing upon those cases about the requirement to disclose opinions from experts before a trial, Mr. Jossart argues "courts have noted that the letters represent conclusions reached with the benefit of hindsight and are not the same as the observations made during treatment." Id. at 13. When called upon at oral argument to explain the basis for the assertion that Dr. Chelimsky reached conclusions with the benefit of hindsight, Ms. Maglio could not. Tr. 2036-37. At best, Ms. Maglio described the argument as "an interpretation of the letter." But this interpretation is not supported by the facts.

Similarly, Mr. Jossart's reliance on the amount of time between the cessation of Dr. Chelimsky's role as one of Mr. Jossart's treating doctors and the date of her statement is not controlling.[17] Certainly, the passage of time could affect the analysis. A longer amount of time might allow the doctor to receive information that was not part of the doctor's medical file. For example, during a lengthy period during which litigation develops, the doctor might receive information created in the context of litigation, such as reports from doctors retained for litigation. But this did not happen here. No evidence shows that Ms. Strait provided Dr. Chelimsky with reports from Dr. Steinman or Dr. Gibbons. Tr. 2055-56. Again, although many years had passed, Dr. Chelimsky based her June 2023 statement on her treatment of Mr. Jossart in 2012-13.

Accordingly, for the reasons set out above, the Vaccine Act requires the production of Dr. Chelimsky's statement. At a minimum, it is either a provider's note or a post-injury report. It is also a treatment note. Thus, Ms. Strait did not have a choice about disclosing it.

3. Non-Testifying Consultant

In resisting a characterization that Dr. Chelimsky's statement is a medical record, Ms. Strait and Ms. Maglio argue that Dr. Chelimsky prepared her statement "as a consulting expert." Pet'r's Reply, filed Dec. 5, 2025, at 10. This position, too, is not persuasive.

The basis of this argument rests on FRCP 26(b)(4)(D).[18] Again, whether the disclosure provisions in FRCP 26 should govern the filing of information in the Vaccine Program is not entirely clear. But if it is assumed for sake of argument that attorneys can seek assistance of

[17] Ms. Maglio conceded that if Mr. Jossart's attorney had received this statement from Dr. Chelimsky in 2018, the attorney would have been required to file the statement. Tr. 2045-46.

[18] This provision states: "a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."

consultants in the litigation without needing to disclose any reports those non-testifying consultants create, Mr. Jossart has not established that Dr. Chelimsky was providing information as a non-testifying expert.

Quoting from a legal treatise, the Secretary suggested functions of a consultant whom an attorney could retain to assist the attorney in litigating the case:

> The consultant can select the relevant medical facts and organize them in their hierarchy of importance. He can teach the attorney why these facts lead to particular conclusions, alert him to alternative possible conclusions arising from the same facts, and explain the strong and weak points in the medical rationales that lead to those conclusions.

Resp't's Resp., filed May 26, 2026, at 6, quoting 4 Am Jur Trials Use of Medical Consultants, 4 Am Jur Trials 253, § 5 (March 2026).

Ms. Strait initially consulted Dr. Chelimsky because Ms. Strait wanted Dr. Chelimsky to provide evidence to support Mr. Jossart's claim that the vaccine caused his POTS to worsen. Ms. Strait wanted Dr. Chelimsky to refute Dr. Gibbons's opinion that Mr. Jossart did not suffer from POTS and his opinion regarding deconditioning. Consistent with a belief that Ms. Strait was attempting to advance Mr. Jossart's Vaccine Program claim, she charged time for consulting Dr. Chelimsky on her timesheets. Most dramatically, Ms. Strait told Dr. Chelimsky, that "I [Ms. Strait] assume the work and opinions can be put on the official record." Exhibit 127 at 2.

There are also few, if any, indicia that Ms. Strait wanted Dr. Chelimsky to join her litigation team. For example, there is no evidence that Ms. Strait shared material protected by the attorney-client privilege. There is no evidence that Ms. Strait discussed her litigation strategy or allowed Dr. Chelimsky to access Ms. Strait's attorney work product. Ms. Strait did not obtain a confidentiality agreement. While none of these factors are determinative, they undermine the argument that Ms. Strait was consulting Dr. Chelimsky so that Ms. Strait could litigate Mr. Jossart's case more effectively. C.f. Hanlon v. Sec'y of Health & Hum. Servs., 191 F.3d 1344, 1350 (Fed. Cir. 1999) (discussing whether a petitioner's consultation with an expert on tuberous sclerosis in one case precluded the respondent's presentation of testimony from the same expert in another case involving tuberous sclerosis); Tr. 2060 (discussing Hanlon).

Collectively, these factors weigh in favor of finding that Ms. Strait did not consult Dr. Chelimsky with a plan to use her as a non-testifying consultant. Rather, it appears that after Ms. Strait received Dr. Chelimsky's statement, which undermined the claim that Mr. Jossart suffered from POTS, Ms. Strait changed her categorization. However, Mr. Jossart has not cited any cases in which a party can legitimately hide a percipient witness's information by labelling him or her a litigation consultant.

Giesecke & Devrient GmbH v. United States, 174 Fed. Cl. 1 (2024), a case the Secretary cited (Resp't's Resp., filed May 26, 2026, at 7), is instructive. In Giesecke, a third-party defendant (Idemia) wanted to depose its former employee, Tom Kinneging, who was knowledgeable about ePassport technologies. As the parties discussed documents that should be

produced, Idemia claimed that some documents were protected by attorney-client privilege and the work product doctrine. Idemia also disclosed that its attorney had retained Mr. Kinneging as a consultant in connection with the lawsuit. Id. at 7-8. The parties also disputed the scope of the anticipated deposition.

In resolving the discovery dispute, Giesecke surveyed cases about consultants under FRCP 26(b)(4)(D). Eventually, Giesecke distilled the cases to a rule that "where, as here, the third-party is a non-testifying expert, RCFC 26(b)(4)(D) can protect the information acquired or opinion formed by the nontestifying expert *only in the scope of the consulting role and in anticipation of litigation*." 174 Fed. Cl. at 18 (emphasis in original). The Court later explained that its approach "ensures that [Idemia] cannot immunize from discovery the facts known and opinions held by a fact witness simply by retaining [the fact witness] as an expert." Id. at 25 (brackets in original).

Giesecke resembles Mr. Jossart's case.[19] Giesecke ruled that information from fact (or percipient) witnesses is subject to being disclosed and cannot be protected from disclosure by simply labeling the person a litigation consultant. Here, Dr. Chelimsky is a percipient witness about her diagnosis of Mr. Jossart in 2012-13. Indeed, she is the best person to explain her diagnosis. As such, Dr. Chelimsky's statement should have been disclosed.

4. Duty to Supplement / Duty of Candor

So far, the analysis about the obligation of Mr. Jossart and Ms. Strait to disclose Dr. Chelimsky's statement has examined an obligation based upon the Vaccine Act, the Vaccine Rules, and the discovery provisions in FRCP 26. However, an attorney's obligations are found in other sources as well.

Attorneys owe judicial officers a duty of candor. The former Chief Justice of the United States Supreme Court commented: "This Court must rely on counsel to present issues fully and fairly, and counsel have a continuing duty to inform the Court of any development which may conceivably affect an outcome." Fusari v. Steinberg, 419 U.S. 379, 391 (1975) (Burger, C.J., concurring). For example, when an affiant withdraws assertions, an attorney may not rely upon the affidavit. Lipman v. Dickinson, 174 F.3d 1363 (Fed. Cir. 1999) (affirming a sanction of a public reprimand).

Although professional rules of ethics include a duty of candor, the limits of that duty are not coextensive with the duty as defined by the ABA's model rule of candor to the tribunal. See Model Rules of Pro. Conduct Rule. 3.3. As the Standing Panel on Attorney Discipline for the

[19] In Giesecke, Idemia disclosed that Mr. Kinneging was a litigation consultant. This disclosure appears appropriate pursuant to Rule 26(b)(2). The disclosure also allows other parties to challenge an assertion of privilege that could justify the withholding of information. See Rule 26(b)(5)(A). By way of contrast, Mr. Jossart did not disclose in June or July 2023 that she obtained information from a person whom Ms. Strait considered to be a litigation consultant. Ms. Strait's original explanation for not producing Dr. Chelimsky's statement was that it was "not germane." Exhibit 118 ¶ 25. Ms. Strait did not originally assert that she had retained Dr. Chelimsky as a litigation consultant.

Court of Federal Claims has stated, "In addition to the duty of candor embodied in Model Rule 3.3, there exists a broader, more general duty of candor." In re Parks, 181 Fed. Cl. 127, 136 n.11 (2026) (citing United States v. Shaffer Equip. Co., 11 F.3d 450, 458 (4th Cir. 1993) ("[N]either [Rule 3.3] nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process.")), modified on reh'g, No. 25-11281, 2026 WL 1579496 (Fed. Cl. June 2, 2026), appeal docketed, No. 2026-1909 (Fed. Cir. June 4, 2026).

According to the chief judge of the Court of Federal Claims, the duty of candor is superior to the duty attorneys owe to their clients. Housing Authority of City of Slidell v. United States, 149 Fed. Cl. 692, 695 n.5 (2020).

One dimension of the duty of candor is the duty to supplement. As set forth in Rule 26(e) of the FRCP, which is captioned "Supplementing Disclosures and Responses," parties are required to update information:

> A party who has made a disclosure under RCFC 26(a) . . . must supplement or correct its disclosure or response:
>
> > A. In a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional of corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Rule 26(e)(1) of the RCFC.

In this case, the parties generally agree that the duty of candor and the duty to supplement could require attorneys to disclose material. For example, when posed with a hypothetical situation in which a witness who previously submitted an affidavit about when a neighbor started having shoulder pain changed his account, Ms. Maglio agreed the attorney was obligated to disclose the amended account. Tr. 2080-81. This example illustrates that the duty of candor and the duty to supplement applies to material other than medical records. See also Contreras v. Sec'y of Health & Hum. Servs., 116 Fed. Cl. 472, 476 (noting that an expert did not act with candor to the court or to the respondent's counsel in failing to supplement the record with information that his medical license had been suspended), vacated on unrelated grounds after intervening proceedings, 844 F.3d 1363 (Fed. Cir. 2017).

Although there is agreement about the duty of candor and duty to supplement generally, the parties part company as to whether Ms. Strait was obligated to take any steps after receiving Dr. Chelimsky's statement. In this regard, Ms. Strait's earlier arguments merit review. To give just one example: Ms. Strait advanced the argument: "Dr. Gisela Chelimsky is one of Petitioner's primary treaters for his POTS and gastrointestinal issues; she originally diagnosed Petitioner with POTS." Pet'r's Pre-hearing Reply, filed Feb. 25, 2021, at 3. For other examples, see bulleted points outlined in Section IV.A.1, regarding relevance. Thus, it is clear that Ms. Strait was stating Dr. Chelimsky diagnosed Mr. Jossart with POTS (not just borderline POTS).

In 2023, Dr. Chelimsky's stated: "He did not show any evidence of POTS in 2013." Exhibit 121. That statement conflicts with the arguments that Ms. Strait advanced in briefs before and after trial. Ms. Strait, as an officer of the court, was obligated to disclose the new information from Dr. Chelimsky and/or to apprise the undersigned that the arguments were no longer valid. Ms. Strait's receipt of very relevant non-privileged information should not have remained hidden.

5. The Secretary's Opportunity

Thus, two different paths converge on the same result—Ms. Strait was required to disclose Dr. Chelimsky's statement because it was a medical record. Independently, Ms. Strait was under an obligation to supplement the record with new information and to correct her earlier arguments pursuant to a duty of candor. However, one final point needs to be addressed.

In oral argument, Ms. Maglio seemed to suggest that because the Secretary knew that Dr. Chelimsky treated Mr. Jossart, the Secretary could have deposed her. Tr. 2054. Given that Ms. Maglio was speaking spontaneously, it is not readily apparent that she had considered the implications of her suggestion, which is problematic for many reasons.

First, Mr. Jossart's and Ms. Strait's obligations to produce medical records are *their* obligations. They are required to do what the law (as found in the Vaccine Act and the Vaccine Rules, etc.) requires them to do. These obligations are not conditional and do not depend upon what the opposing party does. See Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2026 WL 776449, at *19-24 (Fed. Cl. Spec. Mstr. Feb. 17, 2026); Cf. 4DD Holdings, LLC v. United States, 169 Fed. Cl. 164, 179 (2023) (ruling that the United States could not assert the defense of equitable estoppel because "[t]he government comes before the court with unclean hands. It has intentionally destroyed evidence and lied to 4DD about its actions"), mot. for reconsideration denied, No. 15-945C, 2024 WL 2240359 (Fed. Cl. Apr. 26, 2024), aff'd in non-relevant part, vacated in non-relevant part, and remanded, 181 F.4th 1363 (Fed. Cir. 2026); Oak Grove Technologies, LLC, v. United States, 116 F.4th 1364, 1383-85 (Fed. Cir. 2024) (finding that the Court of Federal Claims did not abuse its discretion in imposing a sanction – a financial penalty – against the government when it failed to include documents in the administrative record of a bid protest).

Second, suggesting the Secretary resort to a formal discovery device (a deposition) to obtain information that Mr. Jossart already obtained by informal means is antithetical to how the Vaccine Program operates. As noted earlier, Congress did not want the parties to over-litigate.

Third, although the Secretary knew about Dr. Chelimsky and knew that Mr. Jossart's arguments that he suffered from POTS in 2012-13 rested on Dr. Chelimsky, the Secretary had no awareness that Dr. Chelimsky provided a new statement in 2023. There was a solid basis for the Secretary not expecting a new statement from Dr. Chelimsky—the August 19, 2022 order closed the evidence. Moreover, Ms. Strait did not reveal that she was consulting Dr. Chelimsky. Finally, after receiving Dr. Chelimsky's statement, Ms. Strait did not disclose her receipt of a statement pursuant to FRCP 26(b)(5); see also Tr. 2067-73.

Again, it is not especially clear that Ms. Maglio was attempting to shift responsibility for the omission of Dr. Chelimsky's statement when entitlement was being resolved to the Secretary. But, to the extent that this is Ms. Maglio's position, the position is not persuasive for the reasons listed above.

6. Summary

Overall, Ms. Strait solicited information from the person most knowledgeable about whether Mr. Jossart suffered from POTS in 2012-13: the doctor who had first-hand experience with him and who happens to be an authority on POTS. *Any* information Ms. Strait received would have been relevant to resolving a fundamental question in this litigation—whether Mr. Jossart suffered from POTS in 2012-13.

Effectively, Ms. Strait attempted to set up a "heads I win, tails you lose" situation. If Dr. Chelimsky provided information that helped Mr. Jossart, then Ms. Strait would have filed the statement as evidence. On the other hand, after Dr. Chelimsky did not help Mr. Jossart, then Ms. Strait did not disclose the information. The rules of litigation do not permit this type of game-playing. See In re Social Media Adolescent Addiction / Personal Injury Prod. Liab. Lit., No. 22-md-03047-YGR, 2024 WL 5088103, at * 4 (N.D. Ca. Dec. 11, 2024) (describing a party's attempt to hide a fact witness as a 26(b)(4) consultant as presenting a "heads I win, tails you lose" argument); see also Resp't's Resp., filed Jan. 12, 2025, at 2 (noting the "troubling" nature of a situation if petitioners were allowed "to withhold highly relevant adverse evidence" but could file evidence "if it supported petitioner's entitlement to compensation").

Although Ms. Maglio recognized this concern (Tr. 2049), Ms. Maglio offered no persuasive excuse for failure to file a statement from a treating doctor.

**B. Consequences**

After finding that Ms. Strait should have submitted Dr. Chelimsky's statement, the next issue is how Ms. Strait's failure to act affects the remainder of the litigation, specifically, the pending motion for attorneys' fees and costs. For the reasons explained below, the consequences include (a) a reduction in the amount of attorneys' fees and costs and (2) the issuance of an order to show cause regarding sanctions.

1. Reduction in Attorneys' Fees and Costs

As set forth above, petitioners like Mr. Jossart who do not receive compensation are eligible for a discretionary award of reasonable attorneys' fees and costs provided they acted in good faith and reasonable basis supported the claim. Venerable precedent recognizes that as a case progresses, petitioners may lose their good faith and reasonable basis. Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375 (Fed. Cir. 1994).

Here, after Ms. Strait received Dr. Chelimsky's statement, the case lost both its good faith and reasonable basis. As for reasonable basis, as discussed above, Dr. Chelimsky was the key support for Mr. Jossart's assertion that he suffered from POTS in 2012-13. Again, Dr. Steinman added nothing or next to nothing. After Dr. Chelimsky stated that Mr. Jossart did not have POTS

in 2012-13, Mr. Jossart lost reasonable basis on the claim that the 2012 vaccinations significantly aggravated his POTS.

Similarly, Mr. Jossart's good faith has been called into doubt. Information attorneys learn is imputed to their clients. See Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2025 WL 3004761, at *9 (Fed. Cl. Spec. Mstr. Oct. 1, 2025); Hill v. Dep't of Labor and Industries, 580 P.2d 636, 638 (Wash. 1978) (en banc).[20]

Again, Dr. Chelimsky's statement should have changed Mr. Jossart's understanding of his case. Until the March 2022 hearing, Mr. Jossart may have sincerely believed that he suffered from POTS in 2012-13. But the direct statement from his treating physician contradicted this belief.

Moreover, even if good faith and reasonable basis survived Dr. Chelimsky's statement, special masters enjoy discretion not to award attorneys' fees and costs. James Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1379 (Fed. Cir. 2011). Admittedly, special masters have not used this authority previously. See Cottingham v. Sec'y of Health & Hum. Servs., No. 15-1291, 2021 WL 6881248, *54-55 (Fed. Cl. Spec. Mstr. Sep. 27, 2024).

This case's extraordinary circumstances warrant exercising the discretionary authority to deny attorneys' fees and costs. Congress created the Vaccine Program with features not found in traditional litigation. One unusual aspect is the lack of discovery. Instead of the usual discovery, Congress mandated petitioners to provide all medical records. Another unusual aspect is that petitioners who do not receive compensation are eligible for attorneys' fees and costs. It seems reasonable to link these two aspects, as statutory provisions, including the Vaccine Act, must be considered both in their specific contexts and within the context of the statute as a whole. See, e.g., Figueroa v. Sec'y of Health & Hum. Servs., 715 F.3d 1314, 1318 (Fed. Cir. 2013); Heinzelman v. Sec'y of Health & Hum. Servs., 681 F.3d 1374, 1377 (Fed. Cir. 2012). Moreover, it is within special masters' discretion to deny or reduce fees for failure to comply with the rules of the Vaccine Program. See, e.g., Williams v. Sec'y of Health & Hum. Servs., No. 18-1860V, 2025 WL 755057, at *2 (Fed. Cl. Spec. Mstr. Feb. 11, 2025) (warning counsel that "Failure to comply with the Vaccine Rules and/or Guidelines going forward will result in substantial deductions or nonpayment of fees.")

Attorneys who follow the rules by disclosing all relevant information can benefit by receiving attorneys' fees in cases in which their clients do not prevail.

Here, the conduct of litigation until Ms. Strait received Dr. Chelimsky's statement was above board and reasonable. Thus, Mr. Jossart has been awarded all reasonable fees and costs incurred until June 2023. As set forth above, this amount is $317,101.19. In other words, Ms. Strait's malfeasance is not reducing fees retroactively. But, after June 2023, attorneys' fees and

[20] Ms. Strait is admitted to practice law in the State of Washington, among other jurisdictions. Exhibit 118 ¶ 5.

costs are largely inappropriate.[21] The natural and logical consequence of the failure to submit information that the attorney possesses is a denial of attorneys' fees.

Stopping attorneys' fees and costs with Ms. Strait's receipt of Dr. Chelimsky's statement does not diminish the amount of attorneys' fees and costs greatly. The primary activities after June 2023 were considering a motion for review, requesting redaction, and requesting attorneys' fees. The request for attorneys' fees is reasonable. See footnote 12 above. The request for redaction is not reasonable because if Mr. Jossart had dismissed his case because he could no longer legitimately claim that he suffered from POTS in 2012-13, the resulting decision would have been generic without an extensive recitation of Mr. Jossart's medical history. Thus, redaction would have been unnecessary.

Accordingly, the balance of attorneys' fees and costs incurred after receipt of Dr. Chelimsky's statement (totaling approximately $10,000) is not awarded.

2. Order to Show Cause / Sanctions

Although the natural and logical consequence for Mr. Jossart's law firm is a partial denial of attorneys' fees and costs, Ms. Strait's actions and inactions had secondary effects too. A consequence was that the undersigned was required to write a 69-page single-spaced decision evaluating all the evidence in the record.[22] This record was incomplete because it lacked the statement from the doctor on which Mr. Jossart's assertion that he suffered from POTS in 2012-13 hinged. Determining how the evidence regarding the POTS diagnosis preponderated was not particularly easy as approximately 10 pages were devoted to this topic. After much deliberation, the undersigned found that the evidence did not preponderate in favor of POTS as a diagnosis in 2012-13. Dr. Chelimsky's statement, eventually, corroborated this finding.

While the outcome regarding diagnosis in the May 24, 2024 decision was correct, the time spent deciding the issue would not have been used if Mr. Jossart had filed Dr. Chelimsky's statement. The time unnecessarily spent on Mr. Jossart's case could have been devoted to attending to cases of other petitioners.

Accordingly, Ms. Strait and mctlaw are ordered to show cause as to why mctlaw should not be sanctioned in the amount of $5,000.00. See Penland v. United States, No. 22-62L, 2026 WL 1981703 (Fed. Cl. July 7, 2026), appeal docketed, No. 26-2054 (Fed. Cir. July 20, 2026).

---

[21] Mr. Jossart is allowed the small amount of attorneys' fees and costs for wrapping up the case because these activities would have occurred even if Ms. Strait had filed Dr. Chelimsky's statement in June or July 2023.

[22] The Secretary was not affected greatly because the Secretary filed his post-hearing brief before Ms. Strait received Dr. Chelimsky's statement. However, the Secretary did participate in several rounds of briefing over the failure to disclose Dr. Chelimsky's statement.

This amount is well below the value of time spent on the May 22, 2024 decision.[23] The response to this order to show cause is due within 45 days.

## V. Conclusion

For most of the duration of the case, Mr. Jossart's attorneys litigated the case with professionalism and reasonable basis. A reasonable amount of fees and costs for this phase is $317,101.19.

This amount shall be paid through an ACH deposit to Mr. Maglio's IOLTA account for prompt disbursement. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[24]

Separately, a response to the order to show cause shall be filed within 45 days.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master

[23] For reference, the process of producing Mr. Jossart's prehearing memorandum, which is approximately 50 double-spaced pages, took more than 40 hours at a cost exceeding $15,000.00.

[24] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.